IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SHELBY N. COX, | CASE NO. 1:22-cv-1375 |
| Plaintiff, | DISTRICT JUDGE PATRICIA A. GAUGHAN |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Shelby Cox filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Child's Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In February 2017, Cox filed applications for Supplemental Security Income and Child's Insurance Benefits alleging a disability onset date of

October 1993,[1] and claiming she was disabled due to ADHD, anxiety, asthma, allergies and severe hives, hypothyroidism, high blood pressure, cardiac arrythmia, obesity, a "stomach condition," low immune system, and neurodevelopmental disorders. Tr. 209, 215, 232. The Social Security Administration denied Cox's applications and her motion for reconsideration. Tr. 98–99, 138–39. Cox then requested a hearing before an Administrative Law Judge (ALJ). Tr. 160.

In December 2018, an ALJ held a hearing, Tr. 36–55, and Cox amended her alleged disability onset date to September 10, 2015, Tr. 16, 38. In March 2019, the ALJ issued a written decision finding that Cox was not disabled, Tr. 13–29. Cox appealed and the Appeals Council declined further review. Tr. 1–3. Cox appealed to the United States District Court for the Northern District of Ohio. The parties stipulated to a remand and in October 2021, the Court remanded the case to the Social Security Administration for further consideration of Cox's claim. Tr. 1440.

In August 2021, the ALJ held a new hearing. Cox and a vocational expert testified. Tr. 1374–94. The next month, the ALJ issued a written decision finding that Cox was not disabled. Tr. 1343–63. The ALJ's decision became final on June 9, 2022, when the Social Security Appeals Council declined further review. Tr. 1331–33; *see* 20 C.F.R. § 404.981.

---

[1]  "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

2

Cox filed this action on August 4, 2022. Doc. 1. She asserts the following assignments of error:

> 1.  Whether the administrative law judge erred in his evaluation of treating psychiatrist opinion where he failed to provide good reasons for the weight he gave to this opinion, considering only the standard for determining whether the opinion deserved controlling weight and failing to address whether the opinion still deserved significant weight?
>
> 2.  Whether the administrative law judge's finding concerning residual functional capacity is in error where the opinions of record and the record as a whole document greater limitation on Ms. Cox's ability to perform the mental demands of work and the administrative law judge erred in his evaluation of these opinions?

Doc. 10, at 1.

**Evidence**

*1.    Vocational evidence*

Cox was 21 years old on her amended alleged disability onset date. Tr. 38, 229. She graduated from a high school for students with special needs. Tr. 233, 613. Cox briefly worked as a bell ringer for the Salvation Army. Tr. 40.

*2.    Medical evidence[2]*

Cox has a history of treatment at Applewood Centers for ADHD and an anxiety disorder. Tr. 409, 421. In 2011, when Cox was in tenth grade, she took

---

[2]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs. Cox only challenges the ALJ's decision as to her mental impairments, so I only discuss evidence related to Cox's mental impairments.

Adderall for attention, Clonidine for a sleep aid, and Paxil for anxiety. Tr. 409, 421.

In January 2013, when Cox was two weeks away from finishing high school, she told the nurse at Applewood Centers that she stopped taking Paxil "last summer" because her anxiety was manageable. Tr. 409. The nurse consulted with Cox's mother by telephone and Cox's mother agreed that Cox was doing well without Paxil. Tr. 409. The nurse continued Cox's Adderall and Clonidine. Tr. 409.

In July 2013, when Cox was 19 years old, she went to Nord Counseling Services for an adult diagnostic assessment. Tr. 461. Cox's mother was also present and recounted Cox's history of treatment for ADHD, which began when Cox was four years old, and anxiety. Tr. 461. At the time of Cox's visit, Cox was taking Paxil. Tr. 464. The evaluator assessed Cox with anxiety disorder and borderline intellectual functioning. Tr. 469.

In May 2014, when Cox was 20 years old, she saw Rim Ibrahim, M.D., at the Nord Center for a psychiatric evaluation. Tr. 605–09. Dr. Ibrahim wrote that Cox was "perseverating about being confused and a poor historian and doing better when her mom attends her meeting with her." Tr. 605. Dr. Ibrahim diagnosed Cox with panic disorder without agoraphobia, history of ADHD, and borderline intelligence. Tr. 608. Dr. Ibrahim increased Cox's Paxil to help with increased anxiety and panic attacks and wrote that if focus and

memory continue to be an issue for Cox, they could consider adding Strattera. Tr. 608.

Cox next saw Dr. Ibrahim in February 2015. Tr. 591. Cox's Paxil resolved Cox's panic attacks, but Cox still felt nervous and edgy and she startled easily. Tr. 591. Cox's mother said that Cox had trouble focusing and reported that a social worker at the Salvation Army suggested that Cox seek treatment for ADHD. Tr. 591. Dr. Ibrahim described Cox's mood and affect as "shrugging shoulders, nodding head as answers to questions." Tr. 591. Dr. Ibrahim increased Cox's Paxil for anxiety and started a trial of Strattera for ADHD. Tr. 591.

In June 2015, Cox had a counseling appointment at the Nord Center. Tr. 595–96. Cox's therapist wrote that Cox was "exhibiting symptoms of anxiety with problems concentrating and feeling overwhelmed at times." Tr. 595.

In September 2015, Cox saw Dr. Ibrahim. Tr. 856–57. Cox reported a "partial improvement" in her anxiety and didn't notice a difference taking Strattera. Tr. 856. Cox's mother thought that Cox was calmer with Strattera. Tr. 856. Dr. Ibrahim described Cox's mood and affect as "fidgety, grimacing, shaking legs constantly." Tr. 856. She increased Cox's Paxil and Strattera. Tr. 856. Five days later, Cox saw her counselor and reported that her symptoms were becoming more manageable. Tr. 839. Cox still had "at least 1–2 days of the month that she has an increase in anxiety." Tr. 839, 841.

In October 2015, Cox told Dr. Ibrahim that she felt less anxious and edgy but was still "nervous at times." Tr. 854. Cox denied having depression. Tr. 854. She reported that she voluntarily shook her legs "to be able to focus," and when she was anxious she felt "compelled to shake more to soothe herself." Tr. 854. Dr. Ibrahim increased Cox's Strattera. Tr. 854.

The next day, Cox saw Ronald Smith, Ph.D., for a psychological consultative exam at the Social Security Administration's request. Tr. 612. Cox was 22 years old. Tr. 612. She arrived on time for the exam and said that a friend drove her to the exam. Tr. 612. Dr. Smith "emphasize[d]" that Cox used "the first person plural," referring to herself and her mother when answering questions about why Cox applied for disability. Tr. 612.

Dr. Smith observed that Cox jiggled her leg throughout the interview. Tr. 615. Cox told Dr. Smith that she was diagnosed with anxiety and ADHD at the age of four. Tr. 615. She had never been hospitalized for psychiatric reasons or attempted suicide. Tr. 615. She took Stattera, which kept her ADHD "in check." Tr. 615. Cox described her activities of daily living as caring for feral cats that she and her mother took in. Tr. 616. She sometimes cooked and washed dishes. Tr. 617. She cleaned and shopped for groceries and said that "she could go into a store alone with a list if she had to." Tr. 617. Cox could eat out in a restaurant. Tr. 617. Dr. Smith diagnosed Cox with parent-child relational problem and adjustment disorder with anxiety. Tr. 617. He opined that Cox could understand and remember job instructions but that her ability

to carry them out successfully would be limited to some extent by her social anxiety. Tr. 617. Cox could maintain adequate attention and concentration and should be able to maintain persistence to perform simple one- or two-step tasks. Tr. 618. Cox should be able to deal appropriately with supervisors, but due to anxiety around others she may have some difficulty with co-workers. Tr. 618. Cox may not be able to deal appropriately with some work pressures "of an interpersonal nature in a job setting." Tr. 618. She could handle funds if she were awarded disability benefits. Tr. 618.

In April 2016, Cox saw Dr. Ibrahim and reported feeling less anxious. Tr. 852–53. She no longer felt nervous or edgy and had no recent panic attacks. Tr. 852. She didn't feel the need to shake her leg as she had, although she "chose[] to shake to focus sometimes." Tr. 852. Cox's Strattera was helping— Cox "zon[ed] out less" and "follow[ed] through when people talk[ed] to her." Tr. 852. She was on medication for her thyroid and felt better as a result. Tr. 852. Dr. Ibrahim continued Cox's medications. Tr. 852–53. A few days later, Cox had a counseling appointment. Tr. 874–75. The counselor encouraged Cox to continue to use coping skills when she felt anxious, like listening to music and distracting herself with computer games. Tr. 874.

In July 2016, Cox saw her counselor and reported "some stress due to an online gaming community and people that are 'mean' to [Cox] and her friends." Tr. 872. Cox expressed concern over her "recent increase in being easily startled." Tr. 872. The counselor helped Cox identify coping skills to

7

manage symptoms and encouraged Cox to use them. Tr. 872. Cox "processed successes she is having in managing her anxiety better." Tr. 872.

Later that day, Cox saw Dr. Ibrahim. Tr. 850. The attending nurse observed that Cox had "jerky movement" and was "jumpy constantly moving her legs and had a hard time holding her arm still" when her blood pressure was taken. Tr. 850. Cox's mother said that Cox's thyroid symptoms were acting up—Cox's energy level went "up and down," Cox became overheated when she left the house, and she couldn't leave the house alone. Tr. 850. Cox was easily startled, became shaky, and felt weak. Tr. 850. Strattera helped with Cox's focus and anger, but Cox was "still zoning out and forgetting." Tr. 850. She lacked motivation and was "too sleepy and tired during the day." Tr. 850. Dr. Ibrahim tapered Cox off Paxil because of its sedating qualities and started Cox on Cymbalta. Tr. 850. She increased Cox's Strattera. Tr. 850.

In August 2016, Cox saw Dr. Ibrahim and reported that she was less sleepy since stopping Paxil but still slept a lot during the day. Tr. 848. Cox said that her "shakes [we]re less" with Cymbalta but she still felt restless inside. Tr. 848. Her mood was "even" and she denied increased depression or anxiety attacks. Tr. 848. Dr. Ibrahim summarized Cox's visit: "cognitive limitation, learning problems, ADHD, anxiety. Sleeping most of the time out of boredom, not much to do." Tr. 848. Cox's insurance coverage for transportation to medical appointments had run out and Dr. Ibrahim indicated that she would

connect Cox with resources to remedy the transportation issue. Tr. 848. Dr. Ibrahim continued Cox's Cymbalta and increased Strattera. Tr. 848.

In October 2016, Cox told Dr. Ibrahim that the increased Strattera did not improve her focus. Tr. 846. Her "shakes [we]re less frequent" and Dr. Ibrahim observed no tremors. Tr. 846. Cox said that her health was better, she was starting to understand herself better, and her mood was more stable. Tr. 846. She reported no anger or agitation, no anxiety attacks, and no increased depression. Tr. 846. Dr. Ibrahim listed Cox's diagnoses: other specified anxiety disorder; intellectual developmental disorder; panic disorder; and specific learning disorder with impairments in reading, written expression, and mathematics. Tr. 846. Dr. Ibrahim wrote that Cox's and her mother's co-dependent relationship was preventing Cox from becoming more independent. Tr. 846. Dr. Ibrahim continued Cymbalta and increased Strattera. Tr. 846.

In December 2016, Cox saw Dr. Ibrahim and denied "full blown anxiety attacks." Tr. 844. Dr. Ibrahim continued Cox's Cymbalta and Strattera and added Clonidine for better sleep. Tr. 844. Dr. Ibrahim wrote that she would inquire about Cox's referral status to Community Psychiatric Supportive Treatment. Tr. 844.

In early February 2017, Cox went to her appointment with Dr. Ibrahim without her mother for the second time in a row, which Dr. Ibrahim praised and encouraged. Tr. 842. Four days later, Cox went to her counseling appointment without her mother. Tr. 864. The counselor commented that Cox

9

was more engaged in her session that day. Tr. 864. She had an improved mood and full affect. Tr. 864. Ten days later, Cox and her mother saw Cox's counselor and Qualified Mental Health Specialist Tiffany Schmidt for Community Psychiatric Supportive Treatment. Tr. 862–63. Schmidt helped Cox and her mother organize the paperwork to apply for Cox's disability benefits and assisted them in providing "fully accurate information." Tr. 862.

In late March 2017, Schmidt completed a daily activities questionnaire on Cox's behalf.[3] Tr. 885–86. Schmidt reported that Cox "cannot maintain [activities of daily living] without her mom's assistance." Tr. 885. Cox "does not have any significant relationships outside of that with her mother." Tr. 885. When asked how Cox got along with former workmates, Schmidt wrote that Cox has never worked. Tr. 885. Asked to describe anything that might prevent Cox from performing work activities in a usual workday or work week, Schmidt answered, "[Cox] has attendance issues, higher need for breaks than others, high anxiety, difficulty standing and walking for long periods of time, low tolerance for stress." Tr. 885. Cox can prepare basic foods like sandwiches and frozen meals. Tr. 886. For household chores, Cox tires easily and needs constant reminders. Tr. 886. Cox dresses herself "but does not maintain [illegible]." She sometimes went shopping but not on her own. Tr. 886. Schmidt wrote that Cox's mother assisted Cox in performing the above-listed tasks. Tr.

---

[3]     The writing in Schmidt's questionnaire is faint and difficult to read. I have reproduced what is legible.

886. As for Cox's reliability keeping appointments, Schmidt stated that Cox had difficulty maintaining appointments when transportation wasn't provided. Tr. 886.

In early April 2017, Dr. Ibrahim completed a mental status questionnaire on Cox's behalf. Dr. Ibrahim described Cox's general appearance as appropriately dressed and slightly disheveled. Tr. 882. Cox's flow of conversation and speech showed a "[l]ong lag between questions and patient's answers, hesitation, staring and guarded at times." Tr. 882. Signs and symptoms of anxiety were "stuttering, staring at this writer, hesitant to answer questions." Tr. 882. Cox's thinking was "organized, coherent, with paucity of thought contents." Tr. 882. Cox had "poor ability to sustain attention, concentrate while questions [w]ere asked, [and] questions have to be repeated and rephrased frequently." Tr. 882. She provided "[v]ery short answers, poor vocabulary." Tr. 882. As for insight and judgment, Dr. Ibrahim wrote that Cox had poor insight into her illness, anxiety, anger, sleep, agitation, and anxiety. Tr. 882. "[Cox] is unable to provide … accurate feedback. Feedback is dependent on observation and collateral information provided by her mother and other workers involved in her case treatment[.]" Tr. 882. Cox's judgment "can be poor when angry and irritable, otherwise it is fair." Tr. 882.

Dr. Ibrahim concluded that Cox's ability to remember, understand, and follow directions was "very limited" and Cox's ability to maintain attention was

"poor." Tr. 883. Cox's ability to sustain concentration, persist at tasks, and complete tasks in a timely manner was "impaired." Tr. 883. As for deficiencies in social interaction, Dr. Ibrahim wrote that Cox had "severe anxiety and agitation with social encounters" and "poor adaptive skills and inability to carry o[ut] simple daily tasks." Tr. 883. In reacting to work pressures involving simple, routine, or repetitive tasks, Cox could not "prioritize, plan, sustain attention, process auditory input, or respond appropriately without agitation, crying[,] anxiety[,] and 'blanking.'" Tr. 883. Dr. Ibrahim opined that Cox "is considered hazardous and unable to work safely in a work environment, understand simple instructions and remember them due to poor attention and poor memory." Tr. 883. Cox also had "poor retention," which made it hard for her to learn. Tr. 883. She had very poor adaptive skills. Tr. 883. Cox can't interact with coworkers due to severe social anxiety and poor frustration tolerance or respond appropriately to supervisors' criticism and directions. Tr. 883.

In late May 2017, Schmidt accompanied Cox to an appointment with Cox's primary care physician at Cox's request. Tr. 953. Schmidt described that event: Cox checked herself in at the doctor's office but needed help filling out paperwork. Tr. 953. During the appointment, "Cox tried to answer the doctor's questions on her own but stuttered and was very nervous and difficult to understand." Tr. 953. When the doctor mentioned that Cox had gained weight, Cox "put her head in her hands and became agitated. [She] started to breathe

heavily and motioned to [Schmidt]," who "was able to bring [Cox] to baseline." Tr. 953. Schmidt helped Cox understand the doctor's follow-up instructions. Tr. 953.

In July 2017, Cox regularly saw Schmidt. Schmidt helped Cox with her paperwork for disability, Medicaid, and transportation resources. Tr. 947, 950. Schmidt wrote that, during another appointment with Cox's doctor, Cox could identify her symptoms and felt comfortable talking to the doctor on her own. Tr. 1137. Schmidt told Cox that Cox "will need to attend her doctors['] appointments on her own now that she is comfortable enough to do so." Tr. 1137. Cox said that "she [wa]s ok with not working right now and [wa]sn't interested in looking for a job yet." Tr. 1137.

A week later, Cox and her mother saw neurologist Mark Bej, M.D., for Cox's complaints of neuropathy and hypersomnia. Tr. 1195. Dr. Bej wrote that Cox was "highly anxious, nearly unable to get any history out, constantly looks at mother, who herself provides much history." Tr. 1195. Dr. Bej's exam findings showed that Cox was alert and oriented and had normal thoughts and comprehension. Tr. 1196. She was "flat, dejected … constantly looking to mother for confirmation of [her] own [symptoms], elements of [history], etc." Tr. 1196.

In August 2017, Schmidt visited Cox at home so Cox could give her a letter necessary for Jobs and Family Services and Schmidt, in turn, could obtain a signature from Cox. Tr. 943. Cox said that she was aware of her

13

upcoming appointments and didn't need an appointment with Schmidt. Tr. 943–44.

In October 2017, Cox saw Dr. Ibrahim for a follow-up. Tr. 915. Cox said that she had no new complaints. Tr. 915. Her sleep was "decent" and she didn't feel drained during the day. Tr. 915. Dr. Ibrahim continued Cox's Strattera, Cymbalta, and Clonidine. Tr. 915.

In early November 2017, Cox had an appointment with Schmidt and brought a letter saying that her Social Security claim had been denied. Tr. 1165–66.  Schmidt wrote that Cox didn't understand the letter or the reasons for the denial, and that Schmidt explained it to Cox "line by line." Tr. 1165. Cox became visibly anxious and Schmidt helped Cox "return[] to baseline." Tr. 1165. Otherwise, Cox reported that she was "feeling good" and had been riding her bike around town. Tr. 1165. At an appointment later that month with Schmidt, Schmidt helped Cox and Cox's mother connect with a disability lawyer. Tr. 1167. Schmidt commented that Cox was receptive "but was mildly disconnected from appointment" and "kept bringing her handheld game out to play but was able to be redirected." Tr. 1167.

In January 2018, Cox told Dr. Ibrahim that she took her Strattera "on and off" and didn't perceive a difference. Tr. 1142. Overall, Cox said that her mood was "fair" and she "barely g[o]t[] anxiety attacks." Tr. 1141. Cox's mother told Dr. Ibrahim that Cox couldn't get vocational rehabilitation due to a lack of transportation. Tr. 1142. Dr. Ibrahim stopped Cox's Strattera for a month

and told Cox to monitor her symptoms. Tr. 1142. A month later, Cox reported increased anxiety, worsened sleep quality, and increased irritability, fidgeting, and forgetfulness. Tr. 1145. Cox's exam findings were unremarkable other than Dr. Ibrahim wrote that Cox had fair insight and judgment and poor memory. Tr. 1145. Dr. Ibrahim restarted Cox on Strattera. Tr. 1145.

In March 2018, Cox and her mother saw Schmidt. Tr. 1183. Cox said that she had a difficult time understanding or doing things without her mother and Schmidt reminded Cox of the independence Cox gained when she attended her appointments alone. Tr. 1183. Schmidt "challenged [Cox] to speak for herself instead of looking to her mom for answers." Tr. 1183. Cox responded that "[Cox] know[s] what [she's] saying but sometimes it's easier to let [her] mom talk [be]cause [Cox's mother] knows [Cox] best." Tr. 1183. Schmidt encouraged Cox's mother to let Cox answer questions on her own. Tr. 1183. During the appointment, Schmidt wrote that Cox "needed consistent redirection as she would attempt to play her handheld video game during appointment." Tr. 1183.

Cox's medication management care transferred from Dr. Ibrahim, and in May 2018, Cox saw Psychiatric Mental Health Nurse Practitioner Kimberly Gilbert, MSN. Tr. 1147–49. Cox reported that her mood was stable and she denied feeling depressed, agitated, or overly anxious. Tr. 1147. She said she enjoyed reading on her phone, watching television, and crocheting. Tr. 1147. Gilbert described Cox as pleasant, calm, and engaged. Tr. 1147. Cox was well-

15

groomed, had expressive language, clear speech, logical thoughts, and intact associations. Tr. 1147–48. She was alert and had no abnormal thoughts. Tr. 1147. She had a full affect, fair memory, some developmental delay, a limited fund of knowledge, and poor insight and judgment. Tr. 1148. Gilbert continued Cox's medications. Tr. 1148.

In July 2018, Cox and her mother saw Dr. Bej for a follow-up. Tr. 1110. Dr. Bej wrote that Cox's history was "very difficult …, mostly provided by mom." Tr. 1110. At a follow-up in October, Cox reported a slight improvement in her sleep problems and the physician's assistant commented that Cox was a poor historian. Tr. 1213.

Meanwhile, in early August 2018, Cox saw Schmidt for disability paperwork. Tr. 1187–88. Cox was engaged and answered questions—she could name many strengths but had "difficulty naming 'problem to be addressed.'" Tr. 1187. Cox reported that she 'ha[d]n't had much anxiety lately" and was mostly concerned about her physical health. Tr. 1187. Schmidt described Cox as engaged, receptive, talkative, and "on her phone less … than in previous sessions." Tr. 1187.

In mid-August 2018, Cox saw Gilbert for medication management. Tr. 1153. Gilbert wrote that Cox's mood had "somewhat improved" and that Cox denied feeling depressed or overly irritable. Tr. 1153. Cox had ongoing struggles with social skills "due to chronic anxiety symptoms and associated poor ability to cope." Tr. 1153. During the appointment, Cox was pleasant,

16

cooperative, and hopeful. Tr. 1153. Gilbert continued Cox's medications. Tr. 1151.

Cox's case management services transferred from Schmidt to Qualified Mental Health Specialist Anysia Wharton, BA. Tr. 1189, 1191. In late August 2018, Wharton described Cox's mood and affect as good, Cox's thought process as intact and easy to follow, and Cox's behavior as appropriate. Tr. 1191. Cox made a list of her mental health symptoms but "had difficulty seeing the benefit of taking care of herself." Tr. 1191. She was thinking about getting a job. Tr. 1191. Cox "ha[d] difficulties maintaining boundaries with her mom." Tr. 1191.

In September 2018, Cox and her mother saw Gilbert for a follow up appointment. Tr. 1156. Gilbert wrote that Cox had "almost child-like thought process and verbal responses" and that Cox had "very limited socialization outside of home." Tr. 1156. Cox denied depression. Tr. 1156. She felt focused and not easily distracted. Tr. 1156. Upon exam, Cox had concrete, preoccupied thoughts, and slow, hesitant speech. Tr. 1156. Her language was "expressive." Tr. 1156. Cox was distracted and "slow to process" due to "developmental delay." Tr. 1156–57. Her memory, insight, and judgment were poor and she had a limited fund of knowledge. Tr. 1157. Gilbert continued Cox's medications and recommended psychotherapy. Tr. 1157.

Cox and her mother continued to see Gilbert and Cox had similar exam findings. Tr. 1695–96 (November 2018), 1698–1700 (January 2019). In March

2019, Cox saw Gilbert on her own, and Gilbert commented that Cox was "very engaged today." Tr. 1701. Cox's language remained expressive, Cox's speech was clear, and Cox had "some developmental delay" and was slow to process. Tr. 1701. Her mood was euthymic,[4] she had a full affect, and her insight, judgment, and fund of knowledge were fair. Tr. 1701–02. Wharton assessed Cox's mood and affect as flat, depressed, and down. Tr. 1722 (April 2019), 1724 (May 2019), 1726 (June 2019). Cox also had an intact and easy-to-follow thought process and appropriate behavior. Tr. 1722, 1724, 1726.

In July 2019, Cox saw Wharton and said that she was excited because she went to the park and socialized by herself. Tr. 1728. She was playing Pokemon Go. Tr. 1728. She liked to keep to herself and didn't socialize regularly. Tr. 1728. She was able to develop her individualized support plan. Tr. 1728. Warton's exam findings showed that Cox had a good mood and a full affect. Tr. 1728. In August and October, Cox had an anxious mood and a full or flat affect. Tr. 1730, 1732. Cox went to a young adult church group meeting, which went well. Tr. 1732. She read "fan fiction" to manage her symptoms. Tr. 1732.

Cox continued to see Gilbert and Warton. *E.g.*, Tr. 1716–17, 1736. In January 2020, Cox told Warton that the holidays went well and she was attending church more frequently. Tr. 1736. She wasn't socializing with her

---

[4]     A euthymic affect is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary, at 655 (32d ed. 2012).

family but that didn't bother her. Tr. 1736. In March 2020, Cox stated that she
could handle her anxiety when she was not around a lot of people. Tr. 1740.
She participated in a youth activity and had a good time, and she was working
on maintaining her boundaries with a friend. Tr. 1740. Cox and her mother
were playing Pokemon Go. Tr. 1740. Cox said that she enjoyed spending a lot
of time alone in her room. Tr. 1740. Upon exam, Cox was anxious, had a full
affect, and was pleasant and cooperative. Tr. 1740. In November 2020, Gilbert
replaced Cox's Strattera with Wellbutrin to accommodate another of Cox's
medications. Tr. 1878.

In September 2020, Cox told Wharton that she was excited because she
used a coping tool to manage her symptoms and relax. Tr. 1883. She rejoined
the teen group at church and socialized with her neighbors at a picnic. Tr. 1883.
She wasn't going grocery shopping because she was overheating and feeling
nauseas. Tr. 1883. In December, Cox said she wasn't socializing "because I just
want to stay home and not see anyone." Tr. 1889. She was playing the
videogame Minecraft to stay busy and manage her symptoms. Tr. 1889.

In March 2021, Cox told Wharton that she was attending the young
adult group at the Salvation Army. Tr. 1946. In May, Cox told Gilbert that her
mood was "pretty good," but she had dysphoria, low motivation, and low
energy. Tr. 1944. She didn't feel anxious during the day. Tr. 1944. Gilbert
increased Cox's Wellbutrin. Tr. 1944. In June, Cox told Warton that she was

excited because she joined the YMCA and was going to exercise more. Tr. 1952. She was going out more frequently with her mother. Tr. 1952.

### 3.  *Social worker's letter*

In November 2018, Dale Jones wrote a letter on Cox's behalf. Tr. 369. Jones explained that he was a social worker and program director at the Salvation Army and had known Cox for four years. Tr. 369. Jones wrote that Cox first came to the Salvation Army for "light community service work"—sweeping and mopping floors, cleaning windows, laundering towels, assisting with clean-up at summer day camp, and handing out food bags. Tr. 369. He stated that Cox struggled physically with these tasks and that she also showed signs of difficulty concentrating. Tr. 369. Cox couldn't stay focused on assigned tasks and needed direct supervision to complete most of them. Tr. 369. Cox also had problems managing her emotions of sadness and self-harm. Tr. 369. Cox "at one time in her life was self harming by cutting herself." Tr. 369. Cox "needs assistance with activities of daily living such as personal hygiene, cleaning and personal finances." Tr. 369. Jones added that, "as the months have passed, … Cox became more withdrawn she has stopped attending church and rarely came around." Tr. 369. When she did, Jones wrote, Cox didn't talk or interact with people—she spoke in a low tone and made no eye contact. Tr. 369.

4.    *Function report*

In April 2017, Cox's mother completed a function report on Cox's behalf. Tr. 249–56. Cox's mother wrote that Cox has panic attacks, anxiety, learning disabilities, and difficulty remembering instructions. Tr. 249. Cox took care of pets by feeding and watering them. Tr. 250. Cox sometimes wore the same clothes all week and sometimes needed reminders for personal grooming. Tr. 250–51. She didn't need reminders to take her medication. Tr. 251. Cox bathed once a week and lacked motivation to bathe more often. Tr. 250. She prepared small meals a few times a week. Tr. 251. She performed household chores like washing dishes and sweeping and didn't need help or encouragement to do them. Tr. 251. Cox said that she could go out alone "but usually [her] mom goes with [her]." Tr. 252. Cox shopped in stores and on the computer for "essentials, food, and clothes." Tr. 252. She can pay bills, count change, handle a savings account, and use a checkbook. Tr. 252. Cox did not spend time with others and attended weekly medical appointments. Tr. 253. Cox's mother checked boxes indicating that Cox's ADHD caused problems with memory, concentration, and completing tasks. Tr. 254. Cox can pay attention for a "couple minutes," finished what she started, and followed written instructions well and spoken instructions "pretty well." Tr. 254. She handled stress "a little better than average."

21

5.      *State agency opinions*[5]

In May 2017, Robyn Murry-Hoffman, Ph.D., reviewed Cox's record. Tr. 56–73. Dr. Murry-Hoffman assessed Cox's residual functional capacity (RFC)[6] and found that Cox should be able to complete simple, routine tasks "and even some more detailed tasks with time to learn these." Tr. 71. Cox may be distracted by others if she works in large groups and can complete tasks with no strict production demands or a sustained fast pace. Tr. 71. Cox can go out in public and interact in stores. Tr. 72. She can interact in the workplace but "would benefit from not working with the public, and working with smaller groups of coworkers." Tr. 72. Cox can adjust to changes in the workplace if

---

[5]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[6]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

22

given adequate time to master the new tasks and would benefit from tasks that involve no writing or "dealing with mathematical issues." Tr. 72.

In October 2017, Joseph Edwards, Ph.D., reviewed Cox's record and affirmed Dr. Murry-Hoffman's findings. Tr. 100–15.

### 6.    *Hearing testimony*

Cox, who was represented by counsel, testified at both administrative hearings. At the first hearing, in December 2018, Cox stated that she lived with her mother. Tr. 40. Cox worked as a bell ringer at the Salvation Army for two weeks. Tr. 40. She got bronchitis from standing outside in the cold. Tr. 40–41. Cox said that she doesn't like going out in public and it makes her nervous. Tr. 48. She's a homebody—the only time Cox goes out is when "[her] mom drag[s] [Cox] out with her." Tr. 48. They go out every Wednesday to a church group and "do activities and stuff together." Tr. 49. She sees her doctor or case manager about every three months. Tr. 50.

Cox stated that it has been a long time since she had a panic attack. Tr. 48. She doesn't talk to her former high school friends anymore but talks online to people she knows. Tr. 49–50. Cox helps out at home—her mother has back problems so Cox cooks and washes dishes. Tr. 51. She doesn't go grocery shopping alone, but could if she knew what she was supposed to get. Tr. 51. She worries she will miss something important. Tr. 51.

At the second hearing, held telephonically in August 2021, Cox stated that she lives with her mother. Tr. 1378. Cox doesn't know how to drive. Tr.

1380. When asked whether her anxiety and attention issues had changed during the two years before the hearing, Cox said that she wasn't as anxious. Tr. 1379. But she was also staying home, away from people, because of her lupus and because people are what causes her anxiety. Tr. 1379–80.

Cox and her mother swam at the YMCA about twice a week. Tr. 1380, 1385. Her mother was scheduled to have surgery soon after the hearing so Cox would have to take care of her, including "maybe bring[ing] her some food if she's hungry." Tr. 1380. When asked if Cox cooks for her mother, Cox answered "[n]ot as much … lately" because Cox's hives had returned, making Cox feel bad. Tr. 1380–81. When Cox cooks chicken, she double checks with her mother about whether its cooked enough. Tr. 1390.

Cox said that she gets panic attacks "when people start fighting around [her]." Tr. 1385. When asked if she could be in the pool at the YMCA without her mom, Cox said yes. Tr. 1387. Cox would not have problems with anxiety. Tr. 1387. Her ADHD makes her "wander a lot" but she focuses better when she does multiple things. Tr. 1387. When Cox swims, talking to her mom helps Cox focus on swimming and keeps her calm. Tr. 1387.

When asked if she ever goes to the store by herself, Cox replied, "some." Tr. 1387. "[N]ot counting that I don't drive, it's rare that I go in without [my] mom." Tr. 1387. Usually if Cox goes in herself, "it's just to grab something while [her] mom stays in the car." Tr. 1387. Cox attends a young adult church group with four or five people. Tr. 1388. Her anxiety at church is "not bad." Tr. 1389.

Sometimes Cox feels like she's in people's way when she stands near them. Tr. 1389.

The ALJ told the vocational expert that Cox has no past relevant work. Tr. 1391. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Cox could perform any work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 1391–92. The vocational expert answered that such an individual could perform the following jobs: cafeteria attendant, cleaner housekeeping, and marker. Tr. 1392.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. Born [i]n … 1993, the claimant had not attained age 22 as of [that date], the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).
>
> 2. The claimant has not engaged in substantial gainful activity since … 1993, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).
>
> 3. The claimant has the following severe impairments: asthma without complications; adjustment disorder with anxiety; obesity; peripheral neuropathy; attention deficit hyperactivity disorder (ADHD); hypersomnia; learning disorder; intellectual disorder; tachycardia; lupus; hypothyroidism; and tachycardia (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

25

404.1520(d),    404.1525,    404.1526,    416.920(d),
416.925 and 416.926).

5. After careful consideration of the entire record,
the undersigned finds that the claimant has the
residual functional capacity to perform light work as
defined in 20 CFR 404.1567(b) and 416.967(b) except
should avoid concentrated exposure to extreme
temperatures, excess humidity, and pulmonary
irritants. The claimant is limited to performing
simple tasks with simple instructions, with few if
any workplace changes. Is able to make simple work
related decisions, but no negotiation, arbitration, or
confrontation. Is able to have superficial and brief
interaction with the general public and coworkers.
No strict production quotas i.e. assembly line work.

6. The claimant has no past relevant work (20 CFR
404.1565 and 416.965).

7. The claimant was born [i]n … 1993, and was 0
years old, which is defined as a younger individual
age 18–49, on the alleged disability onset date (20
CFR 404.1563 and 416.963).

8. The claimant has at least a high school education
(20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because
the claimant does not have past relevant work (20
CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work
experience, and residual functional capacity, there
are jobs that exist in significant numbers in the
national economy that the claimant can perform (20
CFR    404.1569,    404.1569(a),    416.969,    and
416.969(a)).

11. The claimant has not been under a disability, as
defined in the Social Security Act, from … 1993,

26

through the date of this decision (20 CFR
404.350(a)(5), 404.1520(g) and 416.920(g)).

Tr. 1349–63.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence

of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

§ 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a

disability determination:

1.  Is the claimant engaged in substantial gainful
    activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically
    determinable impairment, or a combination of
    impairments, that is "severe"? If not, the
    claimant is not disabled.

3.  Does the claimant's impairment meet or equal
    one of the listed impairments and meet the
    duration requirement? If so, the claimant is
    disabled. If not, the ALJ proceeds to the next
    step.

4.  What is the claimant's residual functional
    capacity and can the claimant perform past
    relevant work? If so, the claimant is not
    disabled. If not, the ALJ proceeds to the next
    step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

28

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

*1.    Treating psychiatrist*

Cox argues that the ALJ didn't provide "good reasons" for the weight he gave to Dr. Ibrahim's opinion. Doc. 10, at 16.

Because Cox filed her applications before March 27, 2017, the ALJ evaluated the medical opinion evidence under 20 C.F.R. § 416.927.[7] Tr. 1360. Under 20 C.F.R. § 416.927(c)(2), known as the "treating physician rule," the ALJ must give a treating physician's opinion controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case

---

[7]    New regulations governing opinion evidence came into effect for applications filed on or after March 27, 2017. *See* 20 C.F.R. § 416.920c.

record." 20 C.F.R. § 416.927(c)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to give a treating physician's opinion less than controlling weight, the ALJ must provide "good reasons" for doing so that are "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544 (quoting Soc. Sec. Ruling 96–2p, 1996 WL 374188, at *5 (1996)). In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Here, the ALJ stated that Dr. Ibrahim's opinion was entitled to "little" weight. Tr. 1360. The ALJ recited Dr. Ibrahim's opinion:

> [Cox] is considered hazardous and unable to work safely in a work environment, understand simple instructions and remember them due to poor attention and poor memory. Poor retention makes it hard to learn as well. [Cox] has very poor adaptive skills, is unable to interact with coworkers due to severe social anxiety and poor frustration tolerance. She cannot respond appropriately to criticism and directions provided by supervisors.

Tr. 1360. The ALJ then cited the regulation for evaluating treating physicians' opinions, 20 C.F.R. §§ 404.1527, 416.927, and explained:

> In this case, upon consideration of the evidence, the undersigned finds Dr. Ibrahim's opinion is unsupported and inconsistent with the record as a whole. He notes the claimant is unable to interact

30

with coworkers; however, the claimant noted that she was able to shop in stores, and that the relationship with her mother had improved. On examination, she showed appropriate affective expression and good range of affect. The claimant acknowledged that she cleans, goes grocery shopping and could eat out at a restaurant. (See Exhibit 10F). She testified that she goes to the YMCA to swim. She interacted and spoke well with medical staff, and exams noted that she had expressive language. Additionally, the record does not support a finding that the claimant cannot understand simple instructions, due to poor attention. In fact, the record notes that the claimant's attention and concentration were actually normal. On examination, her thought processes were concrete and she had no abnormal thought processes. She had alert concentration and attention. (Exhibit 24F/20-24). Attention and concentration was noted to be alert in November of 2018 and January of 2019. (37F/24). Accordingly, although a treating relationship exists, Dr. Ibrahim's opinion is inconsistent with the record as a whole, including the mental status exams throughout.

Tr. 1360.

Cox argues that the ALJ "never directly acknowledged that Dr. Ibrahim was a treating physician[.]" Doc. 10, at 18. But the ALJ stated that Dr. Ibrahim had a "treating relationship" with Cox, cited the treating physician regulation, and applied it when he explained that Dr. Ibrahim's opinion wasn't entitled to controlling weight. Tr. 1360. So the ALJ "acknowledged" that Dr. Ibrahim was Cox's treating physician.

Cox asserts that the ALJ erred because he didn't discuss the nature and extent of the treatment relationship and Dr. Ibrahim's specialty. Doc. 10, at

17–18. "Although the regulations instruct an ALJ to consider the[] factors [in 20 C.F.R. § 404.1527], they expressly require only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (rejecting the claimant's argument that the ALJ erred for not discussing the length, nature, and extent of the treatment relationship and the frequency of examination factors in 20 C.F.R. § 404.1527). Here, the ALJ explained that Dr. Ibrahim's opinion was unsupported and inconsistent with the record evidence of Cox's objective exam findings and daily activities. Tr. 1360. *Supportability* and *consistency* are *good reasons* for assigning less than controlling weight to a treating physician's opinion. *See* 20 C.F.R. § 404.1527(c). And, as explained below, the ALJ's reasons are supported by the evidence and are "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406–07 (6th Cir. 2009).

Cox argues that the ALJ erred because he failed to expressly state that his evaluation of Dr. Ibrahim's opinion included *good reasons*. Doc. 9, at 20–21; Doc. 13, at 5–6. Cox doesn't cite legal authority requiring an ALJ to cite the *good reasons* requirement or list the factors. And the cases that Cox cites aren't on point. *See* Doc. 9, at 20; Doc. 13, at 5, 8. In *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009), the Sixth Circuit agreed that the ALJ erred because the

ALJ "did not give any other reasons for rejecting [a treating physician's opinion]" besides commenting that "another physician had reached the opposite conclusion." *Id*. The Court explained, "[n]othing in the regulations indicates, or even suggests, that the [ALJ] may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion." *Id*. Here, unlike in *Hensley*, the ALJ did not reject Dr. Ibrahim's opinion for one, faulty reason.

Cox also cites *Blakley*, 581 F.3d at 407. Doc. 10, at 20; Doc. 13, at 5. In *Blakley*, the ALJ didn't consider one treating physician's opinion at all and didn't state whether another physician was a treating source. 581 F.3d at 407. As for a third treating physician's opinion, the ALJ contemplated the possibility that doctors may offer inaccurate opinions due to sympathy with their patients, or pressure from them, and concluded, without further explanation, that "the opinion in question departs substantially from the rest of the evidence of record." *Id*. The ALJ didn't make those mistakes in Cox's case, however. And in *Rogers v. Comm'r of Soc. Sec.*, the ALJ didn't consider the governing legal authority for fibromyalgia, didn't state what weight he gave to the treating physicians' opinions, and only explained that "the record does not support the limitations of the severity suggested by [the doctor]." 486 F.3d 234, 243–44 (6th Cir. 2007). By contrast, Cox's ALJ did not ignore governing legal authority, stated that he assigned Dr. Ibrahim's opinion *little* weight, and explained why. So none of Cox's cited cases are on point.

Cox contends that the ALJ's reasons for discounting Dr. Ibrahim's opinion are not supported by substantial evidence because the ALJ overstated Cox's activities. Doc. 10, at 18. Cox asserts that the ALJ relied on the statements Cox made to the consultative examiner—that Cox cleaned, grocery shopped, and could eat out in a restaurant. *Id*. "However," Cox writes, "there is no information concerning how frequently … Cox did these activities or whether she could do [them] independently." *Id*. But elsewhere in the decision, the ALJ commented that Cox's function report indicated that Cox cleaned without assistance and shopped in stores. Tr. 1354, 251–52. Indeed, at the first hearing Cox said that she cleaned and could shop in stores by herself if she had to, Tr. 51, and at the second hearing Cox testified that she shopped in stores by herself, Tr. 1387. The fact that Cox usually shopped with her mother doesn't negate the fact that she could, and did, shop alone.

Cox takes issue with the ALJ's statement that Cox swam at the YMCA. Doc. 10, at 19. Cox argues that she testified that she "goes to the pool with her mother and talks with her mother and relies on her mother for prompting to swim more." Doc. 10, at 19. But whether Cox enjoyed talking to her mother when she swam is not dispositive of the ALJ's finding that Cox's swimming at the YMCA undercut Dr. Ibrahim's assertion that Cox can't interact with others. Tr. 1360. In fact, Cox testified that she didn't experience anxiety when she swam and that she could swim without her mother. Tr. 1387.

Next, Cox argues that there is evidence in the record that refutes the ALJ's statement that Cox "interacted and spoke well with medical staff, and exams noted that she had expressive language." Doc. 10, at 19; Tr. 1360. Cox asserts that in July 2017, Dr. Bej described Cox as "highly anxious, nearly unable to get any history out, constantly looks at mother, who herself provides much history." Tr. 1195. In September 2018, a physician's assistant in Dr. Bej's office wrote that Cox was a poor historian and that Cox's mother provided information. Tr. 1213. And, Cox says, "it does not appear that [she] saw Dr. Ibrahim on her own until February 2017, two-and-one-half years after treatment began." Doc. 10, at 19. But Cox concedes that Dr. Ibrahim praised Cox for coming to the appointment alone and encouraged her to be more independent. *Id*.; Tr. 842.

In 2016, Dr. Ibrahim wrote that Cox's and her mother's co-dependent relationship was preventing Cox from becoming more independent. Tr. 846. Dr. Smith came to the same conclusion. Tr. 617. While Cox reported "difficulties maintaining boundaries with her mom," Tr. 1191, Cox later reported that her relationship with her mother had improved, as the ALJ noted, Tr. 1360, 1359 (citing Tr. 1740). So the few occasions in the record showing that Cox did not communicate well with medical staff in the presence of her mother does not negate the ALJ's statement that Cox "interacted and spoke well with medical staff, and exams noted that she had expressive language." Tr. 1360. Cox does not dispute that she was found, on numerous

occasions, to communicate well with medical staff and use language described as "expressive." *See, e.g.*, Tr. 1147–48 (May 2018), 1150–51 (July 2018), 1695–96 (November 2018), 1698–99 (January 2019), 1701–01 (March 2019), 1707–07 (July 2019), 1713–14 (December 2019), 1716–17 (February 2020), 1719–1720 (August 2020), 1877–78 (November 2020), 1943–44 (May 2021). So the ALJ's statement is supported by substantial evidence. *See Francis*, 414 F. App'x at 805 ("The agency's treating-source rule permits an ALJ to reject a treating source's opinion if substantial evidence in the record contradicts it …. even if substantial evidence also supports the opposite conclusion[.]") (internal citations omitted).

Finally, Cox submits that in May 2017, when Schmidt accompanied Cox to a doctor's appointment at Cox's request, Schmidt wrote that Cox "tried to answer the doctor's questions on her own but stuttered and was very nervous and difficult to understand." Doc. 10, at 20, Tr. 953. When the doctor brought up Cox's weight gain, Cox "put her head in her hands and became agitated," started breathing heavily, and motioned to Schmidt, who "was able to bring [Cox] to baseline." Doc. 10, at 20, Tr. 953. But in July 2017, Schmidt wrote that at Cox's next appointment, Cox "could identify her symptoms and felt comfortable talking to the doctor on her own." Tr. 1137. Schmidt told Cox that Cox "will need to attend her doctors['] appointments on her own now that she is comfortable enough to do so." Tr. 1137. And in August 2017, Cox advised Schmidt that she was "aware of her upcoming appointments" and didn't need

an appointment with Schmidt. Tr. 943. So Cox's behavior at the May 2017 doctor's visit doesn't undermine the ALJ's statement that Cox interacted and spoke well with medical staff. *See Francis*, 414 F. App'x at 805.

Cox doesn't challenge the ALJ's reasons for discounting Dr. Ibrahim's finding about Cox's ability to understand simple instructions. Tr. 1360. The ALJ gave *good reasons* for assigning little weight to Dr. Ibrahim's opinion, those reasons are supported by substantial evidence, and they are "sufficiently specific to make clear" why the ALJ gave Dr. Ibrahim's opinion little weight. *Francis,* 414 F. App'x at 804.

### 2.  *Other opinion evidence*

Cox also challenges the ALJ's evaluation of consultative examiner Dr. Smith's opinion and the state agency reviewers' opinions. Doc. 10, at 22. Cox makes the same argument that I rejected above—the ALJ overstated Cox's abilities to grocery shop, eat out at a restaurant, swim at the YMCA, and interact and speak well with medical staff. Doc. 10, at 22 (citing 1360, 1361). Cox's argument fails here for the same reasons. Moreover, the ALJ didn't cite those activities as a reason for assigning "partial" weight to Dr. Smith's opinion. Tr. 1361. Rather, the ALJ explained that, based on Dr. Smith's opinion, the ALJ limited Cox to performing "simple work to prevent an exacerbation of her anxiety, which has largely been managed with medication." Tr. 1361. Cox doesn't challenge that finding.

Cox argues that the ALJ erred when he evaluated the letter submitted by Dale Jones, the program director at the Salvation Army where Cox briefly worked. Doc. 10, at 23. The ALJ gave Jones's letter "little" weight because Jones isn't "an acceptable medical source and appears to be simply repeating the finding of a different party." Tr. 1361. Cox complains that the ALJ still had to "consider" Jones's letter even if Jones isn't an acceptable medical source. Doc. 10, at 23 (citing 20 C.F.R. §§ 404.1513, 416.913). But the ALJ considered Jones's letter, Tr. 1361, so he complied with the regulation. And the ALJ's finding that Jones "appears to be simply repeating the finding of a different party" is accurate and not "unclear," contrary to Cox's assertion. Doc. 10, at 23. Jones wrote that Cox "at one time in her life was self-harming" and that she "needs assistance with daily activities such as personal hygiene, cleaning, and personal finances." Tr. 1361. Jones said that he has known Cox for four years from Cox's visits to the Salvation Army, so he wouldn't know first-hand about any history Cox may have had of self-harming or her need for help cleaning the house and managing her personal finances.[8]

The ALJ also considered the opinion provided by Schmidt, Cox's mental health case manager. Doc. 10, at 24, Tr. 1360–61. Cox complains that the ALJ didn't mention the "case management services [Cox] received [from Schmidt] to help her obtain social services and support her follow-through with

---

[8]     Neither party cites evidence in the record showing that Cox has a history of self-harming.

treatment." *Id.* But Cox doesn't cite legal authority requiring the ALJ to cite Schmidt's role with heightened specificity. The ALJ gave Schmidt's opinion "little" weight because "[Schmidt] does not specifically note the claimant's residual functioning." Tr. 1360. Cox concedes that Schmidt "did not, as the ALJ noted, provide a specific statement of functional limitations." Doc. 10, at 24. Nor does Cox dispute the ALJ's finding that Schmidt wrote that Cox had difficulty attending appointments when she lacked transportation, not because of mental health symptoms. Tr. 1361. Finally, Cox cites Schmidt's description of Cox's need for her mother's help to perform daily activities. Doc. 10, at 24. But as explained above, the ALJ found that evidence showed that Cox could perform activities of daily living without help from her mother.

In short, Cox disagrees with the ALJ's findings, but substantial evidence supports those findings. So the Commissioner's decision must be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: April 24, 2023

           */s/ James E. Grimes Jr.*
           James E. Grimes Jr.
           U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).