UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Shelby Cox, | ) | CASE NO. 1:22 CV 1375 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| Commissioner of Social Security, | ) | Memorandum of Opinion and Order |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

This matter is before the Court upon the Report and Recommendation of Magistrate Judge James E. Grimes, Jr. ("R&R")(Doc. 14), recommending that the Court affirm the decision of the Commissioner. Plaintiff filed objections to the R&R. For the reasons that follow, the R&R is REJECTED, with the exception of the recitation of the medical evidence, and the decision of the Commissioner is VACATED. This matter is REMANDED to defendant for further proceedings consistent with this Opinion.

**FACTS**

1

Plaintiff sought disability benefits based on several impairments. Plaintiff objects only to the Administrative Law Judge's ("ALJ") decision as to plaintiff's mental impairments. Accordingly, only the medical evidence relevant to those impairments is set forth herein. Neither party objects to the Magistrate Judge's recitation of those facts. For ease of reference, those facts are adopted verbatim and set forth below, with the exception of the footnotes. The opinions of the treating physician will be addressed in the context of the objections.

> Cox has a history of treatment at Applewood Centers for ADHD and an anxiety disorder. Tr. 409, 421. In 2011, when Cox was in tenth grade, she took Adderall for attention, Clonidine for a sleep aid, and Paxil for anxiety. Tr. 409, 421.
>
> In January 2013, when Cox was two weeks away from finishing high school, she told the nurse at Applewood Centers that she stopped taking Paxil "last summer" because her anxiety was manageable. Tr. 409. The nurse consulted with Cox's mother by telephone and Cox's mother agreed that Cox was doing well without Paxil. Tr. 409. The nurse continued Cox's Adderall and Clonidine. Tr. 409.
>
> In July 2013, when Cox was 19 years old, she went to Nord Counseling Services for an adult diagnostic assessment. Tr. 461. Cox's mother was also present and recounted Cox's history of treatment for ADHD, which began when Cox was four years old, and anxiety. Tr. 461. At the time of Cox's visit, Cox was taking Paxil. Tr. 464. The evaluator assessed Cox with anxiety disorder and borderline intellectual functioning. Tr. 469.
>
> In May 2014, when Cox was 20 years old, she saw Rim Ibrahim, M.D., at the Nord Center for a psychiatric evaluation. Tr. 605–09. Dr. Ibrahim wrote that Cox was "perseverating about being confused and a poor historian and doing better when her mom attends her meeting with her." Tr. 605. Dr. Ibrahim diagnosed Cox with panic disorder without agoraphobia, history of ADHD, and borderline intelligence. Tr. 608. Dr. Ibrahim increased Cox's Paxil to help with increased anxiety and panic attacks and wrote that if focus and memory continue to be an issue for Cox, they could consider adding Strattera. Tr. 608.
>
> Cox next saw Dr. Ibrahim in February 2015. Tr. 591. Cox's Paxil resolved Cox's panic attacks, but Cox still felt nervous and edgy and she startled easily. Tr. 591. Cox's mother said that Cox had trouble focusing and reported that a social worker at the Salvation Army suggested that Cox seek treatment for ADHD. Tr. 591. Dr. Ibrahim described Cox's mood and affect as "shrugging shoulders, nodding head as answers to questions." Tr. 591. Dr. Ibrahim increased Cox's Paxil for anxiety and started a trial of Strattera for

2

ADHD. Tr. 591.

In June 2015, Cox had a counseling appointment at the Nord Center. Tr. 595–96. Cox's therapist wrote that Cox was "exhibiting symptoms of anxiety with problems concentrating and feeling overwhelmed at times." Tr. 595.

In September 2015, Cox saw Dr. Ibrahim. Tr. 856–57. Cox reported a "partial improvement" in her anxiety and didn't notice a difference taking Strattera. Tr. 856. Cox's mother thought that Cox was calmer with Strattera. Tr. 856. Dr. Ibrahim described Cox's mood and affect as "fidgety, grimacing, shaking legs constantly." Tr. 856. She increased Cox's Paxil and Strattera. Tr. 856. Five days later, Cox saw her counselor and reported that her symptoms were becoming more manageable. Tr. 839. Cox still had "at least 1–2 days of the month that she has an increase in anxiety." Tr. 839, 841.

In October 2015, Cox told Dr. Ibrahim that she felt less anxious and edgy but was still "nervous at times." Tr. 854. Cox denied having depression. Tr. 854. She reported that she voluntarily shook her legs "to be able to focus," and when she was anxious she felt "compelled to shake more to soothe herself." Tr. 854. Dr. Ibrahim increased Cox's Strattera. Tr. 854.

The next day, Cox saw Ronald Smith, Ph.D., for a psychological consultative exam at the Social Security Administration's request. Tr. 612. Cox was 22 years old. Tr. 612. She arrived on time for the exam and said that a friend drove her to the exam. Tr. 612. Dr. Smith "emphasize[d]" that Cox used "the first person plural," referring to herself and her mother when answering questions about why Cox applied for disability. Tr. 612. Dr. Smith observed that Cox jiggled her leg throughout the interview. Tr. 615. Cox told Dr. Smith that she was diagnosed with anxiety and ADHD at the age of four. Tr. 615. She had never been hospitalized for psychiatric reasons or attempted suicide. Tr. 615. She took Strattera, which kept her ADHD "in check." Tr. 615. Cox described her activities of daily living as caring for feral cats that she and her mother took in. Tr. 616. She sometimes cooked and washed dishes. Tr. 617. She cleaned and shopped for groceries and said that "she could go into a store alone with a list if she had to." Tr. 617. Cox could eat out in a restaurant. Tr. 617. Dr. Smith diagnosed Cox with parent-child relational problem and adjustment disorder with anxiety. Tr. 617. He opined that Cox could understand and remember job instructions but that her ability to carry them out successfully would be limited to some extent by her social anxiety. Tr. 617. Cox could maintain adequate attention and concentration and should be able to maintain persistence to perform simple one- or two-step tasks. Tr. 618. Cox should be able to deal appropriately with supervisors, but due to anxiety around others she may have some difficulty with co-workers. Tr. 618. Cox may not be able to deal appropriately with some work pressures "of an interpersonal nature in a job setting." Tr. 618. She could handle funds if she were awarded disability benefits. Tr. 618.

3

In April 2016, Cox saw Dr. Ibrahim and reported feeling less anxious. Tr. 852–53. She no longer felt nervous or edgy and had no recent panic attacks. Tr. 852. She didn't feel the need to shake her leg as she had, although she "chose[] to shake to focus sometimes." Tr. 852. Cox's Strattera was helping— Cox "zone[d] out less" and "follow[ed] through when people talk[ed] to her." Tr. 852. She was on medication for her thyroid and felt better as a result. Tr. 852. Dr. Ibrahim continued Cox's medications. Tr. 852–53. A few days later, Cox had a counseling appointment. Tr. 874–75. The counselor encouraged Cox to continue to use coping skills when she felt anxious, like listening to music and distracting herself with computer games. Tr. 874.

In July 2016, Cox saw her counselor and reported "some stress due to an online gaming community and people that are 'mean' to [Cox] and her friends." Tr. 872. Cox expressed concern over her "recent increase in being easily startled." Tr. 872. The counselor helped Cox identify coping skills to manage symptoms and encouraged Cox to use them. Tr. 872. Cox "processed successes she is having in managing her anxiety better." Tr. 872.

Later that day, Cox saw Dr. Ibrahim. Tr. 850. The attending nurse observed that Cox had "jerky movement" and was "jumpy constantly moving her legs and had a hard time holding her arm still" when her blood pressure was taken. Tr. 850. Cox's mother said that Cox's thyroid symptoms were acting up—Cox's energy level went "up and down," Cox became overheated when she left the house, and she couldn't leave the house alone. Tr. 850. Cox was easily startled, became shaky, and felt weak. Tr. 850. Strattera helped with Cox's focus and anger, but Cox was "still zoning out and forgetting." Tr. 850. She lacked motivation and was "too sleepy and tired during the day." Tr. 850. Dr. Ibrahim tapered Cox off Paxil because of its sedating qualities and started Cox on Cymbalta. Tr. 850. She increased Cox's Strattera. Tr. 850.

In August 2016, Cox saw Dr. Ibrahim and reported that she was less sleepy since stopping Paxil but still slept a lot during the day. Tr. 848. Cox said that her "shakes [we]re less" with Cymbalta but she still felt restless inside. Tr. 848. Her mood was "even" and she denied increased depression or anxiety attacks. Tr. 848. Dr. Ibrahim summarized Cox's visit: "cognitive limitation, learning problems, ADHD, anxiety. Sleeping most of the time out of boredom, not much to do." Tr. 848. Cox's insurance coverage for transportation to medical appointments had run out and Dr. Ibrahim indicated that she would connect Cox with resources to remedy the transportation issue. Tr. 848. Dr. Ibrahim continued Cox's Cymbalta and increased Strattera. Tr. 848.

In October 2016, Cox told Dr. Ibrahim that the increased Strattera did not improve her focus. Tr. 846. Her "shakes [we]re less frequent" and Dr. Ibrahim observed no tremors. Tr. 846. Cox said that her health was better, she was starting to understand herself better, and her mood was more stable. Tr. 846. She reported no anger or agitation, no anxiety attacks, and no increased depression. Tr. 846. Dr. Ibrahim listed Cox's diagnoses: other specified anxiety disorder; intellectual developmental disorder; panic disorder; and

4

specific learning disorder with impairments in reading, written expression, and mathematics. Tr. 846. Dr. Ibrahim wrote that Cox's and her mother's co-dependent relationship was preventing Cox from becoming more independent. Tr. 846. Dr. Ibrahim continued Cymbalta and increased Strattera. Tr. 846.

In December 2016, Cox saw Dr. Ibrahim and denied "full blown anxiety attacks." Tr. 844. Dr. Ibrahim continued Cox's Cymbalta and Strattera and added Clonidine for better sleep. Tr. 844. Dr. Ibrahim wrote that she would inquire about Cox's referral status to Community Psychiatric Supportive Treatment. Tr. 844.

In early February 2017, Cox went to her appointment with Dr. Ibrahim without her mother for the second time in a row, which Dr. Ibrahim praised and encouraged. Tr. 842. Four days later, Cox went to her counseling appointment without her mother. Tr. 864. The counselor commented that Cox was more engaged in her session that day. Tr. 864. She had an improved mood and full affect. Tr. 864. Ten days later, Cox and her mother saw Cox's counselor and Qualified Mental Health Specialist Tiffany Schmidt for Community Psychiatric Supportive Treatment. Tr. 862–63. Schmidt helped Cox and her mother organize the paperwork to apply for Cox's disability benefits and assisted them in providing "fully accurate information." Tr. 862.

In late March 2017, Schmidt completed a daily activities questionnaire on Cox's behalf. Tr. 885–86. Schmidt reported that Cox "cannot maintain [activities of daily living] without her mom's assistance." Tr. 885. Cox "does not have any significant relationships outside of that with her mother." Tr. 885. When asked how Cox got along with former workmates, Schmidt wrote that Cox has never worked. Tr. 885. Asked to describe anything that might prevent Cox from performing work activities in a usual workday or work week, Schmidt answered, "[Cox] has attendance issues, higher need for breaks than others, high anxiety, difficulty standing and walking for long periods of time, low tolerance for stress." Tr. 885. Cox can prepare basic foods like sandwiches and frozen meals. Tr. 886. For household chores, Cox tires easily and needs constant reminders. Tr. 886. Cox dresses herself "but does not maintain [illegible]." She sometimes went shopping but not on her own. Tr. 886. Schmidt wrote that Cox's mother assisted Cox in performing the above-listed tasks. Tr. 886. As for Cox's reliability keeping appointments, Schmidt stated that Cox had difficulty maintaining appointments when transportation wasn't provided. Tr. 886.

In late May 2017, Schmidt accompanied Cox to an appointment with Cox's primary care physician at Cox's request. Tr. 953. Schmidt described that event: Cox checked herself in at the doctor's office but needed help filling out paperwork. Tr. 953. During the appointment, "Cox tried to answer the doctor's questions on her own but stuttered and was very nervous and difficult to understand." Tr. 953. When the doctor mentioned that Cox had gained weight, Cox "put her head in her hands and became agitated. [She] started to breathe heavily and motioned to [Schmidt]," who "was able to bring [Cox] to

5

baseline." Tr. 953. Schmidt helped Cox understand the doctor's follow-up instructions. Tr. 953.

In July 2017, Cox regularly saw Schmidt. Schmidt helped Cox with her paperwork for disability, Medicaid, and transportation resources. Tr. 947, 950. Schmidt wrote that, during another appointment with Cox's doctor, Cox could identify her symptoms and felt comfortable talking to the doctor on her own. Tr. 1137. Schmidt told Cox that Cox "will need to attend her doctors['] appointments on her own now that she is comfortable enough to do so." Tr. 1137. Cox said that "she [wa]s ok with not working right now and [wa]sn't interested in looking for a job yet." Tr. 1137.

A week later, Cox and her mother saw neurologist Mark Bej, M.D., for Cox's complaints of neuropathy and hypersomnia. Tr. 1195. Dr. Bej wrote that Cox was "highly anxious, nearly unable to get any history out, constantly looks at mother, who herself provides much history." Tr. 1195. Dr. Bej's exam findings showed that Cox was alert and oriented and had normal thoughts and comprehension. Tr. 1196. She was "flat, dejected ... constantly looking to mother for confirmation of [her] own [symptoms], elements of [history], etc." Tr. 1196.

In August 2017, Schmidt visited Cox at home so Cox could give her a letter necessary for Jobs and Family Services and Schmidt, in turn, could obtain a signature from Cox. Tr. 943. Cox said that she was aware of her upcoming appointments and didn't need an appointment with Schmidt. Tr. 943–44.

In October 2017, Cox saw Dr. Ibrahim for a follow-up. Tr. 915. Cox said that she had no new complaints. Tr. 915. Her sleep was "decent" and she didn't feel drained during the day. Tr. 915. Dr. Ibrahim continued Cox's Strattera, Cymbalta, and Clonidine. Tr. 915.

In early November 2017, Cox had an appointment with Schmidt and brought a letter saying that her Social Security claim had been denied. Tr. 1165–66. Schmidt wrote that Cox didn't understand the letter or the reasons for the denial, and that Schmidt explained it to Cox "line by line." Tr. 1165. Cox became visibly anxious and Schmidt helped Cox "return[] to baseline." Tr. 1165. Otherwise, Cox reported that she was "feeling good" and had been riding her bike around town. Tr. 1165. At an appointment later that month with Schmidt, Schmidt helped Cox and Cox's mother connect with a disability lawyer. Tr. 1167. Schmidt commented that Cox was receptive "but was mildly disconnected from appointment" and "kept bringing her handheld game out to play but was able to be redirected." Tr. 1167.

In January 2018, Cox told Dr. Ibrahim that she took her Strattera "on and off" and didn't perceive a difference. Tr. 1142. Overall, Cox said that her mood was "fair" and she "barely g[o]t[] anxiety attacks." Tr. 1141. Cox's mother told Dr. Ibrahim that Cox couldn't get vocational rehabilitation due to a lack of transportation. Tr. 1142. Dr.

6

Ibrahim stopped Cox's Strattera for a month and told Cox to monitor her symptoms. Tr. 1142. A month later, Cox reported increased anxiety, worsened sleep quality, and increased irritability, fidgeting, and forgetfulness. Tr. 1145. Cox's exam findings were unremarkable other than Dr. Ibrahim wrote that Cox had fair insight and judgment and poor memory. Tr. 1145. Dr. Ibrahim restarted Cox on Strattera. Tr. 1145.

In March 2018, Cox and her mother saw Schmidt. Tr. 1183. Cox said that she had a difficult time understanding or doing things without her mother and Schmidt reminded Cox of the independence Cox gained when she attended her appointments alone. Tr. 1183. Schmidt "challenged [Cox] to speak for herself instead of looking to her mom for answers." Tr. 1183. Cox responded that "[Cox] know[s] what [she's] saying but sometimes it's easier to let [her] mom talk [be]cause [Cox's mother] knows [Cox] best." Tr. 1183. Schmidt encouraged Cox's mother to let Cox answer questions on her own. Tr. 1183. During the appointment, Schmidt wrote that Cox "needed consistent redirection as she would attempt to play her handheld video game during appointment." Tr. 1183.

Cox's medication management care transferred from Dr. Ibrahim, and in May 2018, Cox saw Psychiatric Mental Health Nurse Practitioner Kimberly Gilbert, MSN. Tr. 1147–49. Cox reported that her mood was stable and she denied feeling depressed, agitated, or overly anxious. Tr. 1147. She said she enjoyed reading on her phone, watching television, and crocheting. Tr. 1147. Gilbert described Cox as pleasant, calm, and engaged. Tr. 1147. Cox was well-groomed, had expressive language, clear speech, logical thoughts, and intact associations. Tr. 1147–48. She was alert and had no abnormal thoughts. Tr. 1147. She had a full affect, fair memory, some developmental delay, a limited fund of knowledge, and poor insight and judgment. Tr. 1148. Gilbert continued Cox's medications. Tr. 1148.

In July 2018, Cox and her mother saw Dr. Bej for a follow-up. Tr. 1110. Dr. Bej wrote that Cox's history was "very difficult ..., mostly provided by mom." Tr. 1110. At a follow-up in October, Cox reported a slight improvement in her sleep problems and the physician's assistant commented that Cox was a poor historian. Tr. 1213.

Meanwhile, in early August 2018, Cox saw Schmidt for disability paperwork. Tr. 1187–88. Cox was engaged and answered questions—she could name many strengths but had "difficulty naming 'problem to be addressed.'" Tr. 1187. Cox reported that she 'ha[d]n't had much anxiety lately" and was mostly concerned about her physical health. Tr. 1187. Schmidt described Cox as engaged, receptive, talkative, and "on her phone less ... than in previous sessions." Tr. 1187.

In mid-August 2018, Cox saw Gilbert for medication management. Tr. 1153. Gilbert wrote that Cox's mood had "somewhat improved" and that Cox denied feeling depressed or overly irritable. Tr. 1153. Cox had ongoing struggles with social skills "due to chronic anxiety symptoms and associated poor ability to cope." Tr. 1153. During the appointment,

7

Cox was pleasant, cooperative, and hopeful. Tr. 1153. Gilbert continued Cox's medications. Tr. 1151.

Cox's case management services transferred from Schmidt to Qualified Mental Health Specialist Anysia Wharton, BA. Tr. 1189, 1191. In late August 2018, Wharton described Cox's mood and affect as good, Cox's thought process as intact and easy to follow, and Cox's behavior as appropriate. Tr. 1191. Cox made a list of her mental health symptoms but "had difficulty seeing the benefit of taking care of herself." Tr. 1191. She was thinking about getting a job. Tr. 1191. Cox "ha[d] difficulties maintaining boundaries with her mom." Tr. 1191.

In September 2018, Cox and her mother saw Gilbert for a follow up appointment. Tr. 1156. Gilbert wrote that Cox had "almost child-like thought process and verbal responses" and that Cox had "very limited socialization outside of home." Tr. 1156. Cox denied depression. Tr. 1156. She felt focused and not easily distracted. Tr. 1156. Upon exam, Cox had concrete, preoccupied thoughts, and slow, hesitant speech. Tr. 1156. Her language was "expressive." Tr. 1156. Cox was distracted and "slow to process" due to "developmental delay." Tr. 1156–57. Her memory, insight, and judgment were poor and she had a limited fund of knowledge. Tr. 1157. Gilbert continued Cox's medications and recommended psychotherapy. Tr. 1157.

Cox and her mother continued to see Gilbert and Cox had similar exam findings. Tr. 1695–96 (November 2018), 1698–1700 (January 2019). In March 2019, Cox saw Gilbert on her own, and Gilbert commented that Cox was "very engaged today." Tr. 1701. Cox's language remained expressive, Cox's speech was clear, and Cox had "some developmental delay" and was slow to process. Tr. 1701. Her mood was euthymic, she had a full affect, and her insight, judgment, and fund of knowledge were fair. Tr. 1701–02. Wharton assessed Cox's mood and affect as flat, depressed, and down. Tr. 1722 (April 2019), 1724 (May 2019), 1726 (June 2019). Cox also had an intact and easy-to-follow thought process and appropriate behavior. Tr. 1722, 1724, 1726.

In July 2019, Cox saw Wharton and said that she was excited because she went to the park and socialized by herself. Tr. 1728. She was playing Pokemon Go. Tr. 1728. She liked to keep to herself and didn't socialize regularly. Tr. 1728. She was able to develop her individualized support plan. Tr. 1728. Warton's exam findings showed that Cox had a good mood and a full affect. Tr. 1728. In August and October, Cox had an anxious mood and a full or flat affect. Tr. 1730, 1732. Cox went to a young adult church group meeting, which went well. Tr. 1732. She read "fan fiction" to manage her symptoms. Tr. 1732.

Cox continued to see Gilbert and Warton. E.g., Tr. 1716–17, 1736. In January 2020, Cox told Warton that the holidays went well and she was attending church more frequently. Tr. 1736. She wasn't socializing with her family but that didn't bother her. Tr. 1736. In March 2020, Cox stated that she could handle her anxiety when she was not around a lot

8

of people. Tr. 1740. She participated in a youth activity and had a good time, and she was working on maintaining her boundaries with a friend. Tr. 1740. Cox and her mother were playing Pokemon Go. Tr. 1740. Cox said that she enjoyed spending a lot of time alone in her room. Tr. 1740. Upon exam, Cox was anxious, had a full affect, and was pleasant and cooperative. Tr. 1740. In November 2020, Gilbert replaced Cox's Strattera with Wellbutrin to accommodate another of Cox's medications. Tr. 1878.

In September 2020, Cox told Wharton that she was excited because she used a coping tool to manage her symptoms and relax. Tr. 1883. She rejoined the teen group at church and socialized with her neighbors at a picnic. Tr. 1883. She wasn't going grocery shopping because she was overheating and feeling nauseous. Tr. 1883. In December, Cox said she wasn't socializing "because I just want to stay home and not see anyone." Tr. 1889. She was playing the videogame Minecraft to stay busy and manage her symptoms. Tr. 1889.

In March 2021, Cox told Wharton that she was attending the young adult group at the Salvation Army. Tr. 1946. In May, Cox told Gilbert that her mood was "pretty good," but she had dysphoria, low motivation, and low energy. Tr. 1944. She didn't feel anxious during the day. Tr. 1944. Gilbert increased Cox's Wellbutrin. Tr. 1944. In June, Cox told Warton that she was excited because she joined the YMCA and was going to exercise more. Tr. 1952. She was going out more frequently with her mother. Tr. 1952.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 72, which governs the matter herein inasmuch as timely objections have been made to the Report and Recommendation, provides in part:

> **(b) Dispositive Motions and Prisoner Petitions.**
> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

As stated in the Advisory Committee Notes, "The term 'de novo' signifies the magistrate's findings are not protected by the clearly erroneous doctrine, but does not indicate that a second evidentiary hearing is required." *citing United States v. Raddatz*, 447 U.S. 667 (1980).

**ANALYSIS**

Plaintiff objects to the ALJ's analysis of Dr. Ibrahim's opinion.

In early April of 2017, Dr. Ibrahim completed a mental status questionnaire. Plaintiff's flow of conversation and speech showed a "[l]ong lag between questions and patient's answers, hesitation, staring and guarded at times." Her mood and affect were "sad, anxious, irritable, and tearful at times." Dr. Ibrahim noted that plaintiff displayed signs and symptoms of anxiety, including "stuttering, staring at this writer, hesitant to answer questions." Her thinking was "organized, coherent, with paucity of thought contents." Plaintiff had "poor ability to sustain attention, concentrate while questions [w]ere asked, [and] questions have to be repeated and rephrased frequently." She provided "[v]ery short answers, poor vocabulary." As for insight and judgment, Dr. Ibrahim indicated that plaintiff had poor insight into her illness, anxiety, anger, sleep, and agitation. "[Plaintiff] is unable to provide ... accurate feedback. Feedback is dependent on observation and collateral information provided by her mother and other workers involved in her case treatment[.]" Her judgment "can be poor when angry and irritable, otherwise it is fair."
(Tr. 882).

Dr. Ibrahim opined that plaintiff was "very limited" in her ability to remember, understand, and follow directions. Her ability to maintain attention was "poor," and her ability to sustain concentration, persist at tasks, and complete tasks in a timely manner was "impaired." Dr. Ibrahim opined that plaintiff had "severe anxiety and agitation with social encounters" and "poor adaptive skills and inability to carry on [sic] simple daily tasks."
(Tr. 883)

Dr. Ibrahim also opined regarding plaintiff's ability to react to work pressures involving simply, routine, or repetitive tasks. She opined as follows:

> [Plaintiff has an] inability to prioritize, plan, sustain attention, process auditory input, or respond appropriately without agitation, crying[,] anxiety[,] and 'blanking.'
>
> She is considered hazardous and unable to work safely in a work environment, understand simple instructions and remember them due to poor attention and poor memory. [P]oor retention, makes it hard to learn as well. [Plaintiff] has poor adaptive skills, is unable to interact with coworkers due to severe social anxiety and poor frustration tolerance. She cannot respond appropriately to criticism and directions provided by supervisors.

Tr. 883.

The questionnaire also provided that Dr. Ibrahim first saw plaintiff on June 20, 2013. The treatment records show that plaintiff saw Dr. Ibrahim a number of times, including approximately ten days prior to the date on which Dr. Ibrahim signed the questionnaire. Treatment records show that plaintiff continued to see Dr. Ibrahim after this date.

The ALJ assigned "little weight" to the opinion or Dr. Ibrahim. The ALJ analyzed the opinion as follows:

> In this case, upon consideration of the evidence, the undersigned finds Dr. Ibrahim's opinion is unsupported and inconsistent with the record as a whole. He [sic] notes the claimant is unable to interact with coworkers; however, the claimant noted that she was able to shop in stores, and that the relationship with her mother had improved. On examination, she showed appropriate affective expression and good range of affect. The claimant acknowledged that she cleans, goes grocery shopping and could eat out at a restaurant. (See Exhibit 10F). She testified that she goes to the YMCA to swim. She interacted and spoke well with medical staff, and exams noted that she had expressive language. Additionally, the record does not support a finding that the claimant cannot understand simple instructions, due to poor attention. In fact, the record notes that the claimant's attention and concentration were actually normal. On examination, her thought processes were concrete and she had no abnormal thought processes. She had alert concentration and attention. (Exhibit 24F/20-24). Attention and concentration was noted to be alert in November of 2018 and January of 2019. (37F/24). Accordingly, although a treating relationship exists, Dr. Ibrahim's opinion is inconsistent with the record as a

11

whole, including the mental status exams throughout.

(Tr. 1360).

Plaintiff argues that the ALJ violated the "treating physician rule[1]" in his assessment of the opinion of Dr. Ibrahim. According to plaintiff, the ALJ failed to discuss the nature and extent of plaintiff's relationship with Dr. Ibrahim. Nor did the ALJ acknowledge that Dr. Ibrahim is a specialist. Plaintiff further points out that the ALJ mischaracterized the evidence he relied on in weighing Dr. Ibrahim's opinion. Plaintiff argues that the ALJ failed to provide "good reasons" supporting his determination.

In response, the government argues that the ALJ is not required to address the nature and length of the treatment relationship between Dr. Ibrahim and plaintiff. Nor does the case law specifically require that the ALJ acknowledge Dr. Ibrahim's speciality in psychiatry. The government argues that the ALJ gave good reasons for assigning little weight to the opinion of Dr. Ibrahim, and the basis for that determination is clear to a reviewing court. In addition, the government points out that the ALJ is not required to address every treatment record.

Upon review, the Court agrees with plaintiff that remand is required.

In assessing the medical evidence supplied in support of a claim, there are certain governing standards to which an ALJ must adhere. Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule. Because treating physicians are the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone, their opinions are generally accorded more weight than those of non-treating physicians. 20 C.F.R. § 416.927(d)(2). Therefore, if the opinion of the

---

[1] Plaintiff filed her application prior to March 17, 2017. As such, the prior regulations govern the ALJ's duties and obligations with respect to opinion evidence. *See*, 20 § C.F.R. 416.927(d)(2).

> treating physician as to the nature and severity of a claimant's conditions is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record, then it will be accorded controlling weight. When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. However, in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding.

*Rogers v Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir. 2007)(citations and quotations omitted). *See also*, Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *4 ("In many cases, a treating physician's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

> There is an additional procedural requirement associated with the treating physician rule. Specifically, the ALJ must provide "good reasons" for discounting treating physicians' opinions, reasons that are sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. The purpose of this procedural aspect of the treating physician rule is two-fold. First, the explanation let[s] claimants understand the disposition of their cases, particularly where a claimant knows that his physician has deemed him disabled and therefore might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. Second, the explanation ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule. Because of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.

*Rogers,* 486 F.3d at 242 (citations and quotations omitted).

"The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide "good reasons" for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Bistek v. Commissioner of*

13

*Social Security*, 880 F.3d 778 (6th Cir. 2017).

Here, the Court finds that the ALJ failed to properly apply the treating physician rule. Although an ALJ need not necessarily go through each of the relevant factors in assigning weight to the opinion, the ALJ must provide good reasons for (1) deciding not to give the opinion controlling weight; and (2) assigning "little weight" to the opinion. Here, the ALJ failed to consider the nature and extent of the treating relationship between plaintiff and Dr. Ibrahim. The record discloses that plaintiff saw Dr. Ibrahim a number of times over the course of several years. Nor in his evaluation of the opinion did the ALJ acknowledge that Dr. Ibrahim is a specialist. Although standing alone the failure to consider these factors may not warrant remand, the Court finds that remand is nonetheless required because overall the ALJ failed to provide "good reasons" for assigning Dr. Ibrahim's opinion "little weight."

The ALJ discounted Dr. Ibrahim's opinion directed at plaintiff's inability to interact with co-workers. The ALJ pointed out that plaintiff was able to shop in stores, and that her relationship with her mother had improved. It is not clear, however, how an improvement in plaintiff's relationship with her mother would counter against Dr. Ibrahim's opinion that plaintiff is "unable to interact with coworkers due to severe social anxiety and poor frustration tolerance." The same holds true with respect to the ALJ's reliance on plaintiff's ability to clean. It appears to have nothing to do with plaintiff's ability to interact with co-workers. The ALJ also notes that plaintiff goes shopping and/or grocery shopping. He relies on the consultative examiner's report, in which plaintiff actually indicated that she "...goes for groceries, and she could go into a store

14

alone with a list if she had to.[2]" (Tr. 617).  In addition, the ALJ points out that plaintiff swims at the YMCA as support for assigning little weight to the opinion of Dr. Ibrahim.  But again, the evidence showed that plaintiff's mother escorted her to the YMCA to swim and sat on a bench to encourage her.  It is not clear to the Court how the fact that she swam at the YMCA with her mother by her side would have any bearing on plaintiff's ability to interact with co-workers.  The ALJ does note that "on examination, [plaintiff] showed appropriate affective expression and good rage of affect."  In addition, the ALJ indicated that plaintiff "interacted and spoke well with medical staff, and exams noted that she had expressive language.[3]"  Overall, however, the Court finds that the "reasons" for assigning little weight to Dr. Ibrahim's opinion that plaintiff is "unable to interact with coworkers due to severe social anxiety and poor frustration tolerance" do not satisfy the "good reasons" requirement.  This is further problematic because the ALJ did not

---

[2]  The consultative examiner opined that plaintiff "should be able to deal appropriately with supervisors, but may have some difficulty with co-workers.  She may not be able to deal appropriately with some work pressures of an interpersonal nature in a job setting."  The ALJ assigned "partial" weight to the opinion of the consultative examiner, but appears to have rejected this aspect of the opinion.  As an aside, the Court notes that the State Agency consultants opined that plaintiff is capable of interacting in the workplace, but would benefit from not working with the public and working with smaller groups of co-workers.  The ALJ also rejected this aspect of the consultants' opinions.

[3]  Although it is not this Court's job to weigh the evidence, the Court notes that some treatment records reflect that plaintiff struggled to interact with medical personnel on a number of occasions.  The ALJ does not cite which records support his conclusion that plaintiff "interacts well with medical personnel," or explain what is meant by that statement.  This makes it difficult to assess whether this is a "good reason" for the weight given to Dr. Ibrahim's opinion.

15

address the nature and frequency of the treatment relationship or Dr. Ibrahim's status as a specialist. For these reasons, the Court finds that remand is required.

In that the ALJ violated the treating physician rule with respect to the opinion of Dr. Ibrahim, the Court need not address plaintiff's objection regarding the evaluation of the other opinion evidence in the record.[4] Nor need the Court address Dr. Ibrahim's opinion regarding The ALJ is directed to evaluate the medical evidence, most notably the opinion or Dr. Ibrahim, as it pertains to plaintiff's mental health impairments. The ALJ need not reconsider any aspect of the decision pertaining to plaintiff's physical impairments, as plaintiff did not object on that basis.

## **CONCLUSION**

For the foregoing reasons, the R&R is REJECTED, with the exception of the recitation of the medical evidence, and the decision of the Commissioner is VACATED. This matter is REMANDED to defendant for further proceedings consistent with this Opinion.

IT IS SO ORDERED.

Date: <u>August 14, 2023</u>

/s/ PATRICIA A. GAUGHAN
United States District Judge

---

[4] The Court notes that the ALJ also discussed Dr. Ibrahim's opinion regarding plaintiff's ability to pay attention and concentrate. Because the Court finds that the ALJ must re-evaluate Dr. Ibrahim's opinion in its entirety in any event, the Court need not specifically address the ALJ's analysis with regard to these limitations.

16